560 P.2d 1216

Julian PEAGLER and Dodge City Motors, Inc., an Arizona Corporation, Appellants,

v.

PHOENIX NEWSPAPERS, INC., an Arizona Corporation, Eugene C. Pulliam, and Albert J. Sitter, Appellees.

No. 12691–PR.

Supreme Court of Arizona, In Banc.

Feb. 4, 1977.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by Harry J. Cavanagh, Richard McC. Shannon, Phoenix, for appellants.

Snell & Wilmer by Arthur P. Greenfield, Phoenix, for appellees.

### STRUCKMEYER, Vice Chief Justice.

Appellants, Dodge City Motors, Inc. and Julian Peagler, brought this suit against Phoenix Newspapers, Inc., Eugene C. Pulliam, Albert Sitter and J. Edward Murray for damages resulting from an allegedly libelous article in a Phoenix newspaper, The Arizona Republic. The Superior Court first summarily entered a judgment dismissing the suit as to Murray, then ordered the suit by Julian Peagler dismissed, and, finally, on December 20, 1972, at the close of appellant Dodge City Motor's case, directed a verdict against it and in favor of the remaining appellees. The Court of Appeals affirmed, 26 Ariz.App. 274, 547 P.2d 1074 (1976). In light of the decision of the Supreme Court of the United States in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), we took review to resolve the question in Arizona of the standard of liability for libel of private individuals damaged by falsehoods in publications of public or general interest or concern. Decision of the Court of Appeals vacated.

Dodge City Motors, Inc. was a corporation engaged in the business of selling new and used automobiles in Phoenix, Arizona and Julian Peagler was its president. Phoenix Newspapers, Inc. is the corporate owner of the Arizona Republic. Eugene C. Pulliam, now deceased, was, at the time of the incident out of which this action arises, its president and publisher. Albert Sitter is a reporter for The Arizona Republic and the author of an allegedly libelous article.

This article was published in The Arizona Republic on August 30, 1970: *

"The Phoenix office of the Better Business Bureau has among its own members some business firms which engage in highly questionable sales methods, two former employes charged last week.

The former employes are Vernon Terrell, former membership chairman, and Mrs. Kay Runser, who resigned Wednesday as the bureau's trade practice consultant.

Both said in a joint interview that they were especially disillusioned when the BBB further tarnished its record by supporting the Direct Sellers Association, formed in early July for the purpose of scuttling House Bill 102, a tough consumer protection measure.

Terrell and Mrs. Runser cited three firms with the longest records of unresolved consumer complaints which are allowed to remain BBB members in good standing.

They were identified, in the order of frequency of complaints as Peagler's Dodge City, 1521 E. Camelback; Carpetime, 1240 E. Indian School, and Family Publications Service, 3424 N. Central.

  ·\*    \*    \*    \*    \*    \*

The greatest number of complaints on file against any one company, Mrs. Runser said, were lodged against Peagler's Dodge City.

Despite the firm's frequent apparent transgressions and lack of response to complaints, no move has been made to reprimand the auto dealership, she said.

Advised of Mrs. Runser's criticisms, [James White, manager of the Better Business Bureau] disclosed that the BBB is planning to bear down on Peagler's.

'I've already talked to the head of the screening committee (about Peagler's),' White said, 'who will take the matter before the board of directors in September to cancel the membership. I've already got 21 complaints written out and ready to go to the board.

'It appears,' White said, 'that many of the complaints (against Peagler's) involve misrepresentation in advertising and sell-

* Matters in the article not material to the litigation have been deleted.

ing. Although I can't prove it, it appears to be based on bait and switch.

'If Kay (Mrs. Runser) would have come to me with this,' White said, 'she would have known what was being done.'

Mrs. Runser said she repeatedly brought the problem to White's attention with no apparent effect.

When originally contacted by The Arizona Republic, both Julian Peagler, owner of the auto agency, and Bob Young, general manager, maintained that the company had not received any complaints from the BBB.

Later, after checking with White, Peagler said that there had indeed been complaints but that they had not been brought to his or Young's attention.

'Now I've asked that these be sent to me personally,' Peagler said. 'Last month we sold 5,000 used and 1,600 new cars and I've been oblivious to these kinds of problems. I did not know of one sales complaint.

'Most complaints,' Peagler added, 'fall in the area that a used car is not satisfactorily described. But I'm not aware of any complaints that are not properly handled.'

    \*     \*     \*     \*     \*     \*"

Because of the article's asserted libelous character, this action was brought by Julian Peagler and Dodge City Motors, Inc. for damages.

The testimony in the trial court established that a few days prior to August 30, 1970, Albert Sitter visited the offices of the Phoenix Better Business Bureau to investigate a connection between the Bureau and an organization known as the Direct Sellers Association. The Direct Sellers Association was a group of businesses engaging in door-to-door sales. Its purpose was to obtain the repeal of certain consumer legislation aimed at abuses in the door-to-door sales industry. Sitter learned that James C. White, manager of the Bureau, was also connected with the Direct Sellers Association. A former employee of the Bureau, Kay Runser, dis-

cussed certain aspects of the Bureau's business with Sitter. After further discussions with still another former employee of the Bureau, the article was written.

## I

Under the First and Fourteenth Amendments of the United States Constitution, the publishers of libelous material or statements may be protected from the consequences of their defamatory utterances. In *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court of the United States ruled that damages cannot be recovered for the defamation of a public official absent clear and convincing proof that the defamatory statement was published with actual malice. Actual malice was there defined as an utterance with knowledge of its falsity or in reckless disregard of whether it was true. *Id.* at 279–80, 84 S.Ct. at 726, 11 L.Ed.2d at 706. And see *Phoenix Newspapers, Inc. v. Church,* 103 Ariz. 582, 589, 447 P.2d 840 (1968). The *New York Times* standard was later extended to include "public figures" in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

After publication of the article and before trial of the action, the rule of *New York Times* was again extended by a plurality of the Court to publications relating to private individuals where the publication was of public or general concern, *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). *Rosenbloom* marked a shift in focus from the status of the plaintiff as a public figure to the public's interest or general concern in the content of the publication. The plurality thought that publication of matters of public interest or concern should be protected to the same extent as the *New York Times* rule protected publications about public officers and public figures.

Appellees concede on appeal that the appellants were neither public officers nor public figures. The learned trial judge, however, believing that the rule of *New York Times* governed either because Peag-

ler was a public figure or the subject matter of the article was a matter of public interest or concern, granted the motion for direct verdict, saying:

"* * * [W]hat this Court would have to do to deny the Motion for Directed Verdict is to find by convincing clarity either that Mr. Sitter lied, or that he had the reckless disregard for the truth.

I don't think the testimony is such that I can find that, and for that reason I'm going to grant the Motion."

Three years later, while this case was on appeal, *Gertz v. Welch, supra,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 was decided. The United States Supreme Court in that case retreated from the extension of the *New York Times* standard as applied in *Rosenbloom,* holding:

"[S]o long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.* at 347, 94 S.Ct. at 3010, 41 L.Ed.2d at 809.

The Court, however, placed certain limitations on state actions: first, that there could be no recovery without fault; second, that recovery could only be had on proof of actual injury; third, that presumed or punitive damages could not be allowed, at least when liability was not based on a showing of knowledge of falsity or reckless disregard for the truth; and, finally, that the rule of *Gertz* would not apply where the contents of the publication were not such as to warn a reasonably prudent publisher of its defamatory potential.

Before considering the course of the decisions in the several states since *Gertz,* we concern ourselves with whether the principle of that case should be applied retroactively to the present case.

The nonretroactivity of Supreme Court decisions in civil cases was the subject of a detailed inquiry in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). There, the Court said:

"In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, see *e. g., Hanover Shoe v. United Shoe Machinery Corp., supra,* [392 U.S. 481] at 496, [88 S.Ct. 2224, 20 L.Ed.2d 1231], or by deciding an issue of first impression whose resolution was not clearly foreshadowed, see, *e.g., Allen v. State Board of Elections, supra,* [393 U.S. 544], at 572, [89 S.Ct. 817, 22 L.Ed.2d 1]. Second, it has been stressed that 'we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' *Linkletter v. Walker, supra,* [381 U.S. 618] at 629, [85 S.Ct. 1731, 14 L.Ed.2d 601]. Finally, we have weighed the inequity imposed by retroactive application, for '[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the "injustice or hardship" by a holding of nonretroactivity.' *Cipriano v. City of Houma, supra,* [395 U.S. 701] at 706 [89 S.Ct. 1897, 23 L.Ed.2d 647]." 404 U.S. at 106–07, 92 S.Ct. at 355, 30 L.Ed.2d at 306.

■ The lack of "substantial inequitable results" compels us to conclude that *Gertz* should be applied retroactively. As indicated, it was not until after the publication of the article that *Rosenbloom* and *Gertz* were decided. The standard of liability before *Rosenbloom* was the common law rule of strict liability; that is, the publisher was responsible for damages without fault upon proof of the falsity of the publication. Prosser on Torts § 113, at 772–74 (4th Ed. 1971); Restatement of Torts § 558, Elements of a Cause of Action for Defamation; Restatement (Second) of Torts, § 580B, comment *b* at 26–27 (Tent. Draft No. 21, 1975); and see, *e. g., Newspaper Pub. Corp. v. Burke,* 216 Va. 800, 803–04, 224 S.E.2d

132, 135 (1976). *Gertz* allows the states to impose liability for defamation under any standard except strict liability. Hence, there can be no inequity, because appellees could not have been misled to their detriment by the change in liability resulting from the decision in *Gertz. Cf. Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

Since the decision in *Gertz*, eight states have adopted a negligence standard by which liability for defamatory falsehood is determined. *Cahill v. Hawaiian Paradise Park Corp.* (Haw.), 543 P.2d 1356 (1975); *Troman v. Wood*, 62 Ill.2d 184, 340 N.E.2d 292 (1976); *Gobin v. Globe Publishing Co.*, 216 Kan. 223, 531 P.2d 76 (1975); *Jacron Sales Co. v. Sindorf*, 276 Md. 580, 350 A.2d 688 (1976); *Stone v. Essex Cty. Newspapers, Inc.* (Mass.), 330 N.E.2d 161 (1975); *Thomas H. Maloney & Sons, Inc. v. E. W. Scripps Co.*, 43 Ohio App.2d 105, 334 N.E.2d 494 (1974), *cert. denied*, 423 U.S. 883, 96 S.Ct. 151, 46 L.Ed.2d 111 (1975); *Martin v. Griffin Television, Inc.*, 549 P.2d 85 (Okl. 1976); *Taskett v. King Broadcasting Co.*, 86 Wash.2d 439, 546 P.2d 81 (1976). Two states have adopted the *New York Times* standard of actual malice. *Walker v. Colorado Springs Sun, Inc.*, 188 Colo. 86, 538 P.2d 450 *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975); *Aafco Heating & Air Conditioning Co. v. Northwest Publications, Inc.* (Ind.App.), 321 N.E.2d 580 (1975), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976). And *see Chapadeau v. Utica Observer-Dispatch, Inc.*, 38 N.Y.2d 196, 379 N.Y.S.2d 61, 341 N.E.2d 569 (1975), in which a standard of gross negligence was adopted. We are not, however so much impressed with the fact that the substantial weight of authority favors the negligence standard as we are with the reasons which compel the rejection of the *New York Times* standard.

In *Gertz*, the Court said:

"The legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood. We would not lightly require the State to abandon this purpose * * *." 418 U.S. at 341, 94 S.Ct. at 3008, 41 L.Ed.2d at 806.

Nor do we think a state should be so solicitous of a publisher of defamatory falsehood that he is virtually insulated from the consequences of his wrong.

In *Taskett v. King Broadcasting Co., supra*, the court said:

"It has been argued by the defense that to reduce the standard first enunciated in *New York Times*, and subsequently adopted in both *Rosenbloom* and *Miller*, [*Miller v. Argus Publishing Co.*, 79 Wash.2d 816, 490 P.2d 101], will have a 'chilling effect' upon the press and, therefore, result in self-censorship. We find this contention to be without merit. It is true that greater caution must now be exercised where the subject of a publication is a private person, yet such a rule is totally justifiable in light of the state's overriding interest in providing a realistic remedy to an otherwise helpless private citizen. It cannot be gainsaid that any social value derived through a defamatory falsehood pertaining to a truly private individual is 'clearly outweighed by the social interest in order and morality.' *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942)." 86 Wash.2d 439, 546 P.2d at 86.

In *Troman v. Wood, supra*, the Illinois Supreme Court said:

"The defendant concedes that the Federal Constitution does not require Illinois to apply the *New York Times* standard. Nevertheless the defendant urges that we should now adopt that standard as a matter of State policy. The arguments in support of that position lean heavily on the adverse effect on freedom of the press which would supposedly follow in the absence of the actual malice standard. But the extent to which liability for defamation adversely affects freedom of speech and press is a Federal constitutional question, and it has been authoritatively determined by the Supreme Court that a standard of liability less rigorous

than that of actual malice will not impermissibly abridge that freedom. In deciding what standard of liability shall now apply to defamatory publications, our function is not to make an independent reappraisal of the requirements of the first amendment, but rather to ascertain whether there is any basis in Illinois law which would prevent the application here of the general principle that a person is responsible for damage that he intentionally or negligently inflicts upon another." 62 Ill.2d at 194, 340 N.E.2d at 296–97.

In *Jacron Sales Co. v. Sindorf, supra,* the Maryland court observed:

"While holding that 'so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability,' 418 U.S. at 347, 94 S.Ct. at 3010, the *Gertz* Court left little doubt of its assumption that most states would adopt a negligence standard. At one point, the Court stated: 'Our inquiry would involve considerations somewhat different from those discussed above if a State purported to condition civil liability on a factual misstatement whose content did not warn a *reasonably prudent* editor or broadcaster of its defamatory potential.' *Id.* at 348, 94 S.Ct. at 3011 (emphasis added). In prohibiting punitive damages, the Court stated that such 'damages are wholly irrelevant to the state interest that justifies a negligence standard for private defamation actions.' *Id.* at 350, 94 S.Ct. at 3012. Justice Blackmun, concurring, flatly states that 'the Court now conditions a libel action by a private person upon a showing of negligence  .  .  .,' *id.* at 353, 94 S.Ct. at 3014, and Chief Justice Burger characterizes the majority opinion as introducing to defamation law the concept of 'negligence,' *id.* at 355, 94 S.Ct. 2997. Justice Brennan refers to 'a reasonable-care standard,' *id.* at 366, 94 S.Ct. 2997, and Justice White's dissent contains similar language." 276 Md. at 594–95, 350 A.2d at 696–97.

■ We hold the standard adopted in the Tentative Draft of the American Law Institute, Restatement (Second) of Torts § 580B, April 5, 1975, is the standard to be followed in this State. Section 580B provides:

"580B. *DEFAMATION OF PRIVATE PERSON*

ONE WHO PUBLISHES A FALSE AND DEFAMATORY COMMUNICATION CONCERNING A PRIVATE PERSON, OR CONCERNING A PUBLIC OFFICIAL OR A PUBLIC FIGURE IN RELATION TO A PRIVATE MATTER, IS SUBJECT TO LIABILITY, IF, BUT ONLY IF, HE

(a) KNOWS THAT THE STATEMENT IS FALSE AND THAT IT DEFAMES THE OTHER,

(b) ACTS IN RECKLESS DISREGARD OF THESE MATTERS, OR

(c) ACTS NEGLIGENTLY IN FAILING TO ASCERTAIN THEM."

■ Negligence is, of course, conduct which creates an unreasonable risk of harm. It is the failure to use that amount of care which a reasonably prudent person would use under like circumstances. The question which the jury must determine from the preponderance of the evidence, *Jacron Sales Co. v. Sindorf,* 276 Md. at 597, 350 A.2d at 698; Restatement (Second) of Torts § 580B, comment *i* at 34 (Tent. Draft No. 21, 1975); is whether the defendants acted reasonably in attempting to discover the truth or falsity or the defamatory character of the publication, *id.,* comment *f* at 31–32.

## II

Appellants urge the trial court erroneously concluded that the newspaper article was libelous per quod. This was because the trial court believed that if extrinsic evidence was needed to show that the article referred to Peagler, it was libelous per quod; whereas, a publication is libelous per quod only if extrinsic evidence is required to establish its defamatory character. *Brayton v. Crowell-Collier Pub. Co.,* 205 F.2d 644 (2d Cir. 1953).

In the present case, a reader of the article would understand that it referred to Peagler individually as well as to the corpora-

tion. The article impeached the integrity and reputation of Dodge City Motors, Inc. by referring to the "firm's frequent apparent transgressions" and "business firms which engage in highly questionable sales methods." Because Peagler was described in the article as the owner of the automobile agency and the article twice referred to Dodge City Motors as Peagler's Dodge City, he was so connected in the article with the business practices of the automobile agency that even the most discriminating reader would not likely distinguish between the practices of the corporation and Peagler. *See* Restatement of Torts § 563.

In Arizona, a publication which impeaches the honesty, integrity or reputation of a person is libelous per se, *Kinsey v. Real Detective Pub. Co.*, 52 Ariz. 353, 80 P.2d 964 (1938); *see* also, Prosser on Torts § 112, at 757–64 (4th Ed.1971); Restatement of Torts § 569, comment *e*; and actionable without proof of special damages because damages are presumed, *Ilitzky v. Goodman*, 57 Ariz. 216, 112 P.2d 860 (1941); *Central Arizona Light & Power Co. v. Akers*, 45 Ariz. 526, 46 P.2d 126 (1935). This article was clearly libelous per se. Hence, the action of the trial court in dismissing Peagler from the suit for the failure to plead special damages was erroneous.

*Gertz*, however, set forth the requirements for the future. Since it does not permit presumed damages, at least when actual malice is not shown, there must be alleged as well as proved all of a plaintiff's compensatory damages. Peagler fulfilled the *Gertz* requirement in this respect because he particularized in his complaint the damages which he suffered. *Time, Inc. v. Firestone*, 424 U.S. 448, 460, 96 S.Ct. 958, 968, 47 L.Ed.2d 154, 166 (1976).

### III

Nor do we agree with the trial court that on the facts the jury could not find that the defendant, Sitter, published a false statement knowingly or in reckless disregard of its truth or falsity. The article charged, for example, that Mrs. Runser said the greatest number of complaints on file against any one company was lodged against Peagler's Dodge City. Mrs. Runser was asked the question at the trial:

"Did you tell him [Sitter] in any context that the greatest number of complaints on file at the Better Business Bureau against any one company was lodged against Peagler's Dodge City?"

She replied:

"No."

The jury could, therefore, have concluded that Sitter was aware that the article was false or that he published it in a reckless disregard of whether it was true or false.

Although Mrs. Runser's testimony was weakened by subsequent cross-examination, if the jury concluded that the story was the product of the defendant's imagination, this would fulfill the burden of establishing a knowing falsehood. *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

Sitter testified:

"Q. I asked you if you were asked this question, Mr. Sitter, on October 12, 1971, at Page 42 of your deposition:

\* \* \* \* \* \*

'QUESTION: Why didn't you ask Mr. White if Peagler's Dodge City was, in fact, the most frequent violator in their records?

'ANSWER: I don't know.'

Did you give that answer to that question?

A. I did give that answer to that question when asked me in the deposition."

If the jury failed to conclude that Sitter knew the article was false, it could still conclude that in publishing Mrs. Runser's statements without seriously attempting to verify them, particularly knowing that she was a disgruntled ex-employee of the Better Business Bureau, he failed to use that amount of care which a reasonably prudent person would use under like circumstances.

### IV

Finally, appellants complain of the admission of certain opinion testimony of a

former managing editor of The Arizona Republic. It is urged that a hypothetical question was asked which contained certain assumed facts which had no basis in the evidence. Since this case must be reversed, it is enough to reiterate that an opinion of a witness is of no probative force when the facts upon which it is based are not fully and correctly stated. *In re Walters' Estate,* 77 Ariz. 122, 267 P.2d 896 (1954). The other errors which are complained of are not likely to be repeated on retrial.

We are mindful of the disposition of the action as to Eugene C. Pulliam in the Court of Appeals. Inasmuch as the appellants do not question that disposition here, we conclude that they are satisfied that the decision was correct. And *see Long v. Mertz,* 2 Ariz.App. 215, 407 P.2d 404 (1965). The Order of the Court of Appeals dismissing as to the appellee, Eugene C. Pulliam, is affirmed.

The judgment of the court below directing a verdict against the Dodge City Motors, Inc. and the Order of December 5, 1972 dismissing the action as to Julian Peagler are reversed with directions to proceed in a manner consistent with this opinion.

CAMERON, C. J., and HAYS, HOLOHAN and GORDON, JJ., concurring.